**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 23-1400**

─────────────

TONYA ANDERSON,

Plaintiff − Appellant,

v.

DIAMONDBACK INVESTMENT GROUP, LLC,

Defendant – Appellee.

─────────────

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, District Judge.  (01:21−cv−00778−LCB−JLW)

─────────────

Argued:  January 23, 2024                    Decided:  September 4, 2024

─────────────

Before DIAZ, Chief Judge, NIEMEYER and RICHARDSON, Circuit Judges.

─────────────

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Niemeyer joined.  Judge Richardson wrote an opinion concurring in part.

─────────────

**ARGUED:**  Wilson Frank Fong, HENSEL LAW, PLLC, Greensboro, North Carolina, for Appellant.  Natasha Marie Durkee, Geoffrey Alexander Marcus, MARTINEAU KING PLLC, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  Elizabeth A. Martineau, MARTINEAU KING PLLC, Charlotte, North Carolina, for Appellee.

─────────────

DIAZ, Chief Judge:

Tonya Anderson was fired from her job with Diamondback Investment Group, LLC, for failing two drug tests. She sued Diamondback for disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. She also claimed that her firing violated a North Carolina law prohibiting discrimination by an employer against an employee for her use of purportedly lawful hemp-derived products containing delta-9-tetrahydrocannabinol ("THC") to treat her anxiety and muscle spasms during nonworking hours, N.C. Gen. Stat. § 95-28.2(b).

Anderson appeals the district court's grant of summary judgment to Diamondback on all her claims. Because Anderson has failed to carry her burden to show that there's a genuine issue for trial as to each of her claims, we affirm.

I.

In reviewing the district court's order granting summary judgment to Diamondback, we view the facts in the light most favorable to Anderson, the nonmoving party. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013).

A.

Anderson suffers from anxiety, which in her case "limits [her] ability to interact with others, sleep, eat, and regulate [her] emotions." J.A. 245 ¶ 6. When her anxiety is left untreated, "[she is] afraid to leave [her] house for fear that [she] will be attacked." J.A. 245 ¶ 6. Anderson also experiences "muscle and joint pain and spasms throughout [her] body . . . that limit [her] ability to sit, stand, walk, and manipulate objects with [her]

2

hands."  J.A. 245 ¶ 7.  If also left untreated, "this debilitating pain renders [her] nearly immobile."[1]  J.A. 245 ¶ 7.

To manage her conditions, Anderson takes "hemp[-derived] products," which have proven for her to be "a successful alternative to prescription pills."  J.A. 245 ¶ 8.   During the relevant time—while she was employed at Diamondback—Anderson took "a combination of Delta[-]8, Delta[-]10, THC[-]O, and H[H]C 1mg in a prefilled 1g vaporizer cartridge," using "the vaporizer as needed, consuming roughly 100mg per day."[2]  J.A. 234. She also used "Full Spectrum CBD[3] Oil."  J.A. 234.  She purchased these products through several retail stores.

B.

 Diamondback is a "land acquisition company," Defendant's Memorandum in Support of its Motion for Summary Judgment at 2, *Anderson v. Diamondback Inv. Grp., LLC*, No. 1:21-cv-778 (M.D.N.C. Nov. 28, 2022), ECF No. 20, "with offices in Guilford County, North Carolina," J.A. 8 ¶ 4.

---

[1] Anderson was diagnosed with anxiety and muscle spasms by Lori Hudson, her "primary care [provider] in Georgia."  J.A. 231 ¶ 11.

[2] The record is silent about the THC content of the hemp-derived products Anderson was taking.

[3] CBD or cannabidiol is a compound found in the cannabis plant.  *See, e.g.*, Scientific Data and Information About Products Containing Cannabis or Cannabis-Derived Compounds; Public Hearing; Request for Comments, 84 Fed. Reg. 12969, 12970 (Apr. 3, 2019).  Anderson was not prescribed CBD by Hudson; it was "self-prescribed" and purchased over the counter by Anderson.  J.A. 179:11–17.  But, says Anderson, Hudson "treated [Anderson]'s anxiety and muscle spasms with CBD."  J.A. 231 ¶ 11.

3

Anderson was hired as a "Contract Liaison" at Diamondback. J.A. 25. Her job duties included tracking the progress of commercial real estate contracts and conducting title research.

Anderson's offer letter from Diamondback stated that during the company's 90-day "introductory period," "employees may be laid off or discharged . . . as exclusively determined by Management." J.A. 25. Diamondback also gave Anderson a copy of its Employee Manual. The Manual included (and Anderson was aware of) this subsection on drug and alcohol testing:

> Under [Diamondback]'s drug and alcohol testing policy, current and prospective employees will be asked to submit to drug and alcohol testing. No prospective employee will be asked to submit to testing unless an offer of employment has been made. An offer of [employment], however, is conditioned on the prospective employee['s] testing negative for drugs and alcohol. All employees are subject to random drug testing with or without cause. Refusal of drug testing can/will result in immediate termination.

J.A. 133.

C.

Throughout her introductory period at Diamondback, Anderson consumed "[a] dropper full" of CBD oil in the morning before work and "a draw [of her vaporizer, likely containing Delta-8] at lunch time." J.A. 184:17–185:5. The hemp-derived products she used never made her high or affected her work performance. And she maintains that she "ha[s] never smoked marijuana or used illegal drugs." J.A. 244.

As required by Diamondback's drug-testing policy, Anderson submitted to a "pre-employment" urinalysis test. J.A. 211. The test, administered by an outside facility, tested for, among other things, amphetamines, cocaine, marijuana, opiates, and PCP.

4

Shortly after Anderson began working for Diamondback, the test came back positive for marijuana.  Bradley Yoder, Anderson's supervisor, asked Diamondback's owners, Zach Tran and Hal Kern, if they would give Anderson another opportunity to test. Yoder did so because he "never saw any bad signs of performance" from Anderson, and it was worth making sure that . . . we gave her every opportunity to remain as [an] employee." J.A. 58:5–8.  After speaking with Tran and Kern, Yoder called Anderson to inform her that she'd failed the drug test but would be given a chance to retest.

For the second test, Yoder met Anderson at the testing facility.  Anderson provided two urine samples.  That same day, Anderson emailed Tran, Kern, and Yoder:

> Thank you for giving me the opportunity for a second drug test.  I am not sure why my first results came back positive, as I discussed with [Yoder] earlier this afternoon.  Had I know[n] there was a chance for a positive result, I definitely would have met with you in person about the possible outcome. I was caught off guard this morning by [Yoder's] call because I do not do drugs – recreational or prescription.  *However, I do take CBD, Midol, Aleve-D and Benadryl for health issues.  Those are the four items I had in my system during the first test, and these are the four items I have in my system now.*
>
> Midol is for female issues, Aleve-D and Benadryl are for sinus and allergies issues, *and the CBD is for everything else . . . .*
>
>     . . . .
>
> If this second test comes back positive, I pray that you take into consideration my past and what has placed me in my new life here in North Carolina.  *I can supply you with my dog's service animal license and I can get my doctor to verify the reason why I use CBD instead of prescription medication that may treat one symptom but cause more problems in the long run . . . .*
>     . . . .
>
> Again, thank you for this opportunity.  *Like I said before, had I known there was a chance that the first test would come back with these results, I would have given you a heads up then.*  I just didn't think anything about it.  If you

5

decide that *my health issues* are too much to deal with and your company is better off without me, I understand.  No worries, and no hard feelings.

J.A. 216–17 (emphases added).

About a week later, the second test came back as "invalid," J.A. 213 (cleaned up), so Anderson took a third test.  Yoder again accompanied Anderson to the testing facility.  The results of this test were positive for marijuana.

Yoder and Anderson "briefly discussed" her anxiety while at the facility for the second and third tests.  J.A. 110:6–20.  Anderson told Yoder that the test might come back positive because she used CBD for anxiety.

Yoder discussed with Tran and Kern the conversations he had with Anderson at the testing facility.  He was "relatively certain" that he told Tran and Kern that Anderson took CBD for anxiety.[4]  J.A. 112:21–115:20.  When Yoder relayed Anderson's claim "that CBD oil can create positive results in a drug test," J.A. 106:5–6, Tran and Kern said that "they were not comfortable with that at their company" because "it was [an illegal] type of product or something that was a derivative of that product," *id.* 105:19–106:17.

Anderson claims that "[she] informed Diamondback about [her] disability and treatment with CBD by telling [Yoder], and providing him with a note from [her] doctor." J.A. 246 ¶ 11; *see also* J.A. 183:18–25 (testifying that she gave a doctor's note to Yoder). When asked about this note at her deposition, however, Anderson couldn't recall whether

---

[4] Anderson claims that Yoder discussed with Kern and Tran her "anxiety, pain, and hemp use," Appellant's Br. at 5, but the evidence shows only that Yoder testified to being "relatively certain," J.A. 115:14, and that he told Kern and Tran that Anderson took CBD for her anxiety, *see* J.A.106:3–115:20.

Yoder had then given the note to either Kern or Tran. J.A. 184:11–16. Yoder couldn't recall receiving a doctor's note from Anderson, but he did remember that she told him she could get one. J.A. 115:21–25.

The doctor's note, signed by "Lori Hudson RN, FNPC" of "Temple Medical Clinic" in Villa Rica, Georgia, says that "[t]he purpose of this statement is to verify the validity of a patient of mine, Tonya Anderson." J.A. 249. The rest of the note reads: "I can verify that she is taking over the counter CBD products for anxiety and muscle spasm[s]. It is common for THC to show up in a drug urine screen because of these products. I can vouch for this patient that she is only on the natural product of CBD." J.A. 249.

D.

Kern and Tran directed Yoder to terminate Anderson. When Yoder informed Anderson of Diamondback's decision, he explained that she was being terminated "[b]ecause of the positive drug test[s]." J.A. 82:3–7.

E.

After she was terminated, Anderson filed a charge with the Equal Employment Opportunity Commission, which in turn issued her a notice of right to sue. She then sued in the district court raising three claims: (1) a wrongful discharge claim under the ADA; (2) a failure to accommodate claim under the ADA; and (3) a claim for discrimination for the lawful use of lawful products during nonworking hours under N.C. Gen. Stat. Section 95-28.2. J.A. 10–11.

After discovery, Diamondback moved for summary judgment on all claims. In a thorough opinion, the district court granted Diamondback's motion.

7

First, as to Anderson's wrongful discharge claim, the district court found that "[o]n the record in this case, . . . [Anderson] has failed to provide sufficient evidence to raise a genuine dispute of material fact that she is an individual with a disability as defined by the ADA and therefore she has failed to establish the first element of a prima facie case." *Anderson v. Diamondback Inv. Grp., LLC*, 661 F. Supp. 3d 415, 422 (M.D.N.C. 2023). But even if she had provided sufficient evidence of a disability, the district court reasoned, "[Anderson]'s wrongful discharge [claim] would nevertheless fail" because Diamondback had established "a legitimate, nondiscriminatory reason for discharging [her][:] . . . testing positive on at least two drug tests in violation of [Diamondback]'s employment policies." *Id.* at 424. And, the district court found, Anderson then failed to carry her burden under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework to point to evidence sufficient to create a genuine issue of material fact as to whether Diamondback's proposed legitimate, nondiscriminatory reason was a mere pretext. *Anderson*, 661 F. Supp. 3d at 424.

The district court likewise determined that Diamondback was entitled to summary judgment on Anderson's failure to accommodate claim because of a lack of evidence creating a triable issue of fact. *Id.* at 426. "As with [Anderson]'s wrongful discharge claim," the district court found, "[Anderson] lacks sufficient evidence to raise a genuine dispute regarding whether she is an individual with a disability." *Id.* at 425. But even if Anderson had satisfied this initial burden, the district court continued, her failure to accommodate claim would still fail because Anderson hadn't produced evidence sufficient

to "create a genuine issue of material fact regarding whether she provided notice of her disability to [Diamondback]," *id.* at 425, or that she needed an accommodation, *id.* at 426.

Finally, on Anderson's state-law discrimination claim, the district court concluded that Diamondback was entitled to summary judgment based on an exception permitting employers to restrict the use of lawful products if the restriction is tied to a "bona fide occupational requirement . . . reasonably related to the employment activities." *Id.* at 428 (citing N.C. Gen. Stat. § 95-28.2(c)(1)). It found that "[b]ecause [Diamondback]'s drug policy tests only for the presence of illegal or heavily regulated substances, the Court has no difficulty finding that that Defendant has shown that it acted in good faith, honestly, and sincerely in implementing a drug policy to promote workplace safety and productivity in the workplace." *Id.* And it also explained that "for the same reason[,] [] [Diamondback]'s policy was reasonably related to its employment activities in that it was related to maintaining safety in the workplace." *Id.*

This appeal followed.

## II.

We review a motion for summary judgment de novo. *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 413 (4th Cir. 2015). Summary judgment is appropriate if, "view[ing] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party," *Libertarian Party*, 718 F.3d at 312, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

9

"As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a "dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Where, as here, the nonmoving party bears the ultimate burden of proof at trial, the moving party may discharge its initial burden at summary judgment by "showing—that is, pointing out to the . . . court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this initial burden, the burden then shifts to the nonmoving party, who must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up).

"Under this standard, '[t]he mere existence of a scintilla of evidence' is insufficient to withstand an adequately supported summary judgment motion." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 702 (4th Cir. 2023) (quoting *Anderson*, 477 U.S. at 252). "Similarly, 'conclusory allegations or denials, without more, are insufficient to preclude granting [a] summary judgment motion.'" *Id.* (quoting *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)). To discharge her burden, the nonmoving party may also "show[] that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(B). If the nonmoving party fails to establish a triable issue of fact "on an essential element of her case with respect to which she has the burden

10

of proof," "[t]he moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (cleaned up).

### III.

On appeal, Anderson challenges the district court's determination that she failed to proffer sufficient evidence to establish a genuine dispute of material fact as to her wrongful discharge, failure to accommodate, and state-law discrimination claims. We address each claim in turn, beginning with Anderson's wrongful discharge claim.

### A.

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

At the summary judgment stage, "[d]isability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015).

Under the *McDonnell Douglas* framework (which Anderson relies on here), a plaintiff must first make out "a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000). The burden then shifts to the employer, who must establish that there was "a legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (cleaned up). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Id.* (cleaned up). If the employer discharges its

11

burden, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Id.* at 143 (cleaned up).

Importantly, "[t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

1.

To make out a prima facie case of wrongful discharge under the ADA, "[Anderson] was required to produce evidence sufficient to demonstrate that (1) [s]he was a qualified individual with a disability; (2) [s]he was discharged; (3) [s]he was fulfilling h[er] employer's legitimate expectations at the time of discharge; and (4) the circumstances of h[er] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (cleaned up).

As in the district court, the parties here dispute the first prong, or whether Anderson has produced sufficient evidence to establish she was disabled under the ADA.

Under the ADA, a disability means:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment . . . .

42 U.S.C. § 12102(1)(A)–(C).

Anderson claims that she offered sufficient evidence to establish both that she was "actually disabled" and that she was "regarded as disabled" under 42 U.S.C. § 12102(1)(A)

12

and (C).  *See* Appellant's Br. at 11–14.  Anderson maintains that she suffers from both physical (muscle spasms) and mental (anxiety) impairments that substantially limit her life activities (e.g., sitting, standing, walking, and leaving her home).

To support these claims, Anderson points to her affidavit, the note from Nurse Hudson, and her December 2020 email to Tran, Kern, and Yoder.

Diamondback primarily objects to the lack of "expert [medical] evidence," Appellee's Br. at 17, to support these claims.  "While [it] acknowledges that expert evidence is not always required to establish a disability," Diamondback insists that in cases like this one, "courts have generally required expert testimony when 'a condition would be unfamiliar to a lay jury and only an expert could diagnose that condition.'"  *Id.* (quoting *Mancini v. City of Providence*, 909 F.3d 32, 41 (1st Cir. 2018)).

Anderson concedes that she didn't offer expert testimony about her medical conditions, but contends that her affidavit alone is enough to put the issue of disability in dispute.

There are several problems with Anderson's argument.  Setting aside whether a layperson's testimony (without more) is enough to establish a "disability" under the ADA, we have serious doubts that Anderson's evidence met her burden.

Take Anderson's December 2020 email.  It never once mentions her anxiety or muscle spasms, or that she was using hemp-derived products to treat these conditions.  Rather, Anderson says only that she takes products like Midol "for female issues, Aleve-D and Benadryl [] for sinus and allergies issues, and [] CBD [] *for everything else*."  J.A. 251 (emphasis added).  That statement is far too vague to provide notice of a disability.

13

True, Anderson does later mention in her email that she has or had a "service dog . . . who sits in [her] lap to calm [her] down when [she] start[s] getting overwhelmed," J.A. 251, and that she "c[ould] supply [Diamondback] with [her] dog's service animal license," J.A. 252. And she also offers in the email to "get [her] doctor to verify the reason why [she] uses CBD instead of prescription medication." J.A. 252. But we doubt that these vague statements, without more, sufficiently alerted Diamondback to a specific impairment, *see* 42 U.S.C. § 12102(1)(A), or to the possibility that she was *presently* suffering from an impairment, *see id.* § 12102(1)(C).

Nor does this evidence prove that Anderson's conditions substantially limited a major life activity, or that Diamondback had cause to believe they did. And the note from Nurse Hudson, offered to "verify that [Anderson] is taking . . . CBD products for anxiety and muscle spasm[s]," J.A. 249, says nothing about how her conditions affect her major life activities.

That leaves Anderson's affidavit.[5] In it, she briefly asserts that her anxiety affects her "ability to interact with others," regulate her emotions, leave her house, eat, and sleep, J.A. 245 ¶ 6, and that her muscle and joint pain limits her ability to "sit, stand, walk, and manipulate objects with [her] hands," J.A. 245 ¶ 7. The district court viewed these assertions as conclusory. *See Anderson*, 661 F. Supp. 3d at 423 (rejecting statements in

---

[5] Anderson also argues that her deposition testimony, speaking "to both mental and physical impairments that substantially limit major life activities like sitting, standing, and eating," is sufficient to establish that she is disabled under the ADA. Appellant's Br. at 13. Because this evidence is duplicative of, and just as cursory as, the statements in her affidavit, we don't address it separately.

14

Anderson's affidavit as "mere conclusory statements of opinion by [Anderson] untethered to any specific facts, medical evidence, or other competent evidence" and concluding that they "do not provide sufficient admissible evidence from which a reasonable factfinder could conclude that [Anderson] did have anxiety and joint pain, and further that such impairment is a disability in that it substantially limits a major life activity").

We tend to agree with the district court that these bare assertions lack essential information—they don't tell us much of anything about how Anderson's conditions limited her major life activities. Whether Anderson was required to offer medical evidence to carry her burden on this element, however, is a separate question, and one we don't resolve here.

But it can't be the case that a recitation of the statute, without more, is enough to establish a substantial limitation. And our research hasn't uncovered a case accepting such sparse statements (nor has Anderson pointed to one). In fact, the cases we've found hold the opposite. *See, e.g.*, *Mancini*, 909 F.3d at 44 (recognizing that a plaintiff's affidavit alone could be enough to establish an impairment that substantially limits a major life activity if it "elaborated in detail upon the plaintiff's injuries, symptoms, and treatment," but that "wholly conclusory allusions to substantially limited performance of major life activities" are insufficient (comparing *Holton v. First Coast Serv. Options, Inc.*, 703 F. App'x 917, 921 (11th Cir. 2017), with *Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 447 (5th Cir. 2018)).

But because we can dispose of this appeal on other grounds, we'll assume without deciding that Anderson adequately discharged her burden to establish she was an individual with a disability as defined by the ADA, whether that be because she was actually disabled

15

under § 12102(1)(A), or "regarded as" disabled under § 12102(1)(C).[6]  And because Diamondback doesn't dispute that Anderson has carried her burden with respect to the remaining elements of her prima facie case, we move to the second stage of the *McDonnell Douglas* analysis.

2.

So the burden now shifts to Diamondback to offer a legitimate, nondiscriminatory reason for Anderson's termination.  It has: during her 90-day introductory period, Anderson twice tested positive for marijuana, an illegal drug, in violation of Diamondback's drug and alcohol testing policy.

Diamondback's Employee Manual warned that "[a]n offer [of employment] [from] [Diamondback] is conditioned on the prospective employee's testing negative for drugs and alcohol." J.A. 133.  Anderson acknowledged receiving both the Manual and the results of the drug tests.  And she doesn't dispute that the test results were accurate.

Rather, Anderson contends that positive tests can't be offered as a legitimate, nondiscriminatory reason for her termination because the policy is itself discriminatory.  In her view, the policy doesn't distinguish between illegal drug users and people who treat their disabilities with remedies that contain either illegal substances or legal substances that

---

[6] We've previously recognized that the ADA Amendments Act of 2008, which states that "the definition of disability 'shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by [its] terms,'" *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014) (quoting 42 U.S.C. § 12102(4)(A)), was intended "to make it 'easier for people with disabilities to obtain protection under the ADA,'" *Jacobs*, 780 F.3d at 572 (quoting 29 C.F.R. § 1630.1(c)(4)). Given that, we think it best to assume that Anderson has discharged this minimal burden.

16

may register on a drug test as illegal. So rather than attacking the purported reason for her termination as a pretext for discrimination at the third step of the *McDonnell Douglas* analysis, she contends that "because of her disability and treatment, Diamondback's drug testing policy is not a legitimate nondiscriminatory reason for her termination," Appellant's Br. at 15. We disagree.

First, this argument misapprehends our analysis at step two of the *McDonnell Douglas* framework. The inquiry at this stage is whether the employer has met its burden of production, not persuasion. *See Burdine*, 450 U.S. at 254–55. And the employer meets this burden merely by offering "reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

Second, Anderson points to no authority suggesting that a reason for the adverse employment action offered by an employer that touches conduct covered by the ADA—but isn't itself discriminatory and therefore prohibited by law—can't be offered for this purpose. To the contrary, Supreme Court cases on disparate treatment and disparate impact discrimination claims hold that a facially neutral legitimate, nondiscriminatory reason that affects protected classes differently is nevertheless a valid one. *E.g.*, *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). Even when a protected characteristic is "correlated" with the reason given by an employer for the adverse employment decision, such as an employee's pension status, that doesn't make the reason unlawfully discriminatory. *See id.* at 611.

17

Take *Hazen*. In that case, a sixty-two-year-old former employee claimed that his employer violated the Age Discrimination in Employment Act of 1967 ("ADEA") by firing him just before he reached the required ten years of service with the company for his pension plan rights to vest. *See id.* at 606–07, 611. A jury agreed, rendering a verdict in his favor on, as relevant here, his ADEA claim. *Id.* at 606. After the district court denied, in relevant part, his employer's motion for judgment notwithstanding the verdict, the employer appealed. *Id.* at 607.

The First Circuit affirmed judgment for the employee on his ADEA claim, reasoning that the jury could have found the employee's age to be "inextricably intertwined" with the reason given for his termination: his almost-vested pension rights. *Id.* at 607. But the Supreme Court vacated and remanded the case "for the Court of Appeals to reconsider whether the jury had sufficient evidence to find an ADEA violation," *id.* at 614, holding that "an employer does not violate the ADEA just by interfering with an older employee's pension benefits that would have vested by virtue of the employee's years of service," rather than his age, *id.* at 613.

The Court explained that pension plans, which become "'vested,' once the employee completes a certain number of years of service with the employer," typically correspond with an employee's age. *Id.* at 611. "Yet an employee's age is analytically distinct from his years of service[:] An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, *see* 29 U.S.C. § 631(a), may have worked for a particular employer his entire career, while an older worker may have been newly hired." *Id.* (emphasis added).

18

So "[b]ecause age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily [unlawfully] age based." *Id.* (cleaned up). And even though it might've been the case that the older employees of the company were "more likely to be 'close to vesting' than younger employees," the Court explained, "a decision by the company to fire an older employee solely because he has nine-plus years of service and therefore is 'close to vesting' would not constitute discriminatory treatment on the basis of age." *Id.* at 611–12.

Consider next *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003). There, "[p]ursuant to company policy," an employee who appeared to be under the influence of drugs or alcohol took a drug test and tested positive for cocaine. *Id.* 46–47. After admitting to drinking and using cocaine the night before the test, the employee was "forced to resign" "[b]ecause [his] behavior violated [the company]'s workplace conduct rules." *Id.* at 47.

When the employee later applied to be rehired by the company, his application was rejected pursuant to a company policy "against rehiring employees who were terminated for workplace misconduct." *Id.* The former employee then sued the company under the ADA, claiming that he was discriminated against because he was a recovering drug addict. *See id.* at 49. In response, his employer argued that it "applied [its] neutral policy against rehiring employees previously terminated for violating workplace conduct rules and that this neutral company policy constituted a legitimate and nondiscriminatory reason for its decision not to rehire [the plaintiff]." *Id.* at 50–51.

19

The district court granted summary judgment to the plaintiff's former employer on his ADA disparate-treatment claim, and the plaintiff appealed. *Id.* at 49. On appeal, the Ninth Circuit, "although admitting that [employer]'s no-rehire rule was lawful on its face, held the policy to be unlawful 'as applied to former drug addicts whose only work-related offense was testing positive because" such a policy has a disparate impact on recovering drug addicts. *Id.* at 51 (quoting *Hernandez v. Hughes Missile Sys. Co.*, 298 F.3d 1030, 1036 (9th Cir. 2002), *vacated sub nom. Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003)).

The Supreme Court disagreed, however, finding that "[the employer]'s proffer of its neutral no-rehire policy plainly satisfied its obligation under *McDonnell Douglas* to provide a legitimate, nondiscriminatory reason for refusing to rehire [the employee]." *Id.* at 53. Indeed, the Court later described the no-rehire policy as "a quintessential legitimate, nondiscriminatory reason for refusing to rehire an employee who was terminated for violating workplace conduct rules." *Id.* at 54–55. Said the Court, "the only relevant question before the [Ninth Circuit], after petitioner presented a neutral explanation for its decision not to rehire respondent, was whether there was sufficient evidence from which a jury could conclude that petitioner did make its employment decision based on respondent's status as disabled despite petitioner's proffered explanation." *Id.* at 53.

We too have accepted reasons offered by employers that, at least arguably, relate to characteristics protected by anti-discrimination statutes. Consider our decision in *Conkwright v. Westinghouse Electric Corp.*, 933 F.2d 231 (4th Cir. 1991). In that case, the plaintiff claimed he was unlawfully laid off by his employer, Westinghouse, due to his age. *See id.* at 233. In response, Westinghouse asserted that the reason for the plaintiff's

20

termination was the loss of "a major defense contract" which required "a reduction-in-force (RIF) for [the plaintiff's] division." *Id.* And "[t]o implement the RIF, Westinghouse's manager of human resources asked each manager to identify those employees who were 'lowest rated' on the performance scale." *Id.*

But when "[a]n initial list submitted by the managers had a disproportionate number of older Westinghouse employees[,] . . . Westinghouse's senior management set guidelines for adjusting the lists so that no one close to vesting [in the company's pension plan] would be laid off." *Id.* The three "lowest rated" employees on the adjusted lists—including the plaintiff—were then laid off. *Id.*

Just as Anderson here claims that Diamondback's policy inherently discriminates against disabled employees, the plaintiff in *Westinghouse* asserted that "the rating system was . . . infected with bias toward [himself] and older workers." *Id.* 234. We rejected this argument as "misplaced" and concluded that "[d]eciding to lay off someone based on a company-wide performance rating system, which has been in place for years and which has not been shown to be discriminatory, and choosing to lay off all those who were among the lowest rated, must count as an articulation of a legitimate, non-discriminatory reason." *Id.* (internal quotation marks omitted).

This conclusion tracks with the Supreme Court's recognition in *Furnco Construction Corp. v. Waters*—a Title VII racial discrimination case involving an employer's refusal to hire two qualified Black applicants and its delayed hiring of a third— that an employer's evidentiary burden at step two isn't to provide a reason that eliminates any possibility of discrimination. *See* 438 U.S. 567, 570 (1978). The Court explained that

21

instead, "[w]hen the prima facie case is understood in the light of the opinion in *McDonnell Douglas*, it is apparent that the burden which shifts to the employer is merely that of proving that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race." *Id.* at 577.

And to do so, the employer in a refusal-to-hire case "need not prove that he pursued the course which would both enable him to achieve his own business goal *and* allow him to consider the *most* employment applications." *Id.* Rather, "Title VII prohibits him from having as a goal a work force selected by any proscribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees." *Id.* at 577–78.

So too here. Diamondback was free to implement a drug testing policy that results in the termination of an individual taking what the unchallenged drug test results showed to be an illegal drug—marijuana—to treat a disability, if that policy doesn't have, as a goal, the intentional exclusion of any individual taking a *lawfully prescribed* drug to treat a disability.[7] *See* 42 U.S.C. § 12114(a) ("For purposes of this subchapter [of the ADA], a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of

---

[7] *Cf. Rowles v. Automated Prod. Sys., Inc.*, 92 F. Supp. 2d 424, 430 (M.D. Pa. 2000) (outlining, upon motion for reconsideration, its previous finding that employer's drug and alcohol abuse policy prohibiting "use or possession of legally prescribed controlled substances" violated the ADA because it "summarily exclude[d] individuals who take [legally prescribed controlled substances like] Phenobarbital in order to control the seizures related to their epilepsy from employment").

22

such use."). "We have no authority simply to require employers to use the 'best' standards and procedures available to them," *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989), meaning we can't, for instance, require that Diamondback institute a drug testing policy that accounts for positive results caused by self-prescribed substances of unknown origin that register on a drug test as an illegal controlled substance.

For these reasons, we find, as the Supreme Court did in *McDonnell Douglas*, that Anderson's alleged "participation in unlawful conduct . . . as the cause for h[er] [termination]" "suffices to discharge [Diamondback's] burden of proof at this stage and to meet [Anderson's] prima facie case of discrimination." *McDonnell Douglas*, 411 U.S. at 803.

And because Anderson has "point[ed] to no evidence to show that [Diamondback]'s reason for firing her was a mere pretext," *Anderson*, 661 F. Supp. 3d at 424, and has in fact conceded that it was not, we affirm the district court's determination that Diamondback is entitled to summary judgment on Anderson's wrongful discharge claim.

B.

We now turn to Anderson's ADA failure-to-accommodate claim. An employer may also violate the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A). As relevant here, "[t]he term 'reasonable accommodation' may include . . . appropriate adjustment or modifications of examinations, training materials or policies." 42 U.S.C. § 12111(9)(B).

23

"To survive summary judgment on [a failure-to-accommodate] claim under the ADA, a plaintiff must show (i) she was disabled, (ii) the employer had notice of her disability, (iii) she could perform the essential functions of her position with a reasonable accommodation, and (iv) the employer refused to make such accommodation." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022).

"Before opining on the fourth element" of a plaintiff's failure-to-accommodate claim, this court in *Cowgill* recognized that a court "must first consider what accommodation [plaintiff] requested." *Id.* That question marks the end of our analysis.

Even assuming Anderson had established the other elements of a failure-to-accommodate claim—for instance, that she was disabled, and that Diamondback had notice of her disability—her claim still fails because she hasn't pointed to any evidence suggesting that she requested an accommodation. *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013) ("The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability.");[8] *cf.* N.C. Gen. Stat. § 168A-4(a) ("A qualified person with a disability requesting a reasonable accommodation must apprise the employer . . . of his or her disabling condition, submit

---

[8] As *Wilson* explained, the ADA regulations provide" that "'[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Wilson*, 717 F.3d at 346 (quoting 29 C.F.R. § 1630.2(o)(3)).

24

any necessary medical documentation, make suggestions for such possible accommodations . . ., and cooperate in any ensuing discussion and evaluation aimed at determining possible or feasible accommodations.").

Anderson insists that "[w]ith the reasonable accommodation of foregoing Diamondback's drug testing policy and allowing her to use legal hemp to treat her disability, [she] could['ve]. . .perform[ed] all the essential functions of her job." Appellant's Br. at 20. But this argument presupposes that she requested that precise accommodation—Anderson provides no evidence suggesting that she ever has. Nor does she explain why such an accommodation would be "reasonable" as that term is defined under the ADA by 42 U.S.C. § 12111(9).

The drug testing policy—of which Anderson was aware—applied to all incoming and prospective employees. Rather than seeking an exemption from the policy (or any other relief) before the first test was administered, or even after the first test returned a positive result, Anderson chose to submit to the drug tests.

The district court concluded that Diamondback was entitled to summary judgment on Anderson's failure-to-accommodate claim in part because she "ha[d] not cited any part of the record to support her contention that she requested an accommodation." *Anderson*, 661 F. Supp. 3d at 426. Because Anderson has likewise failed to do so on appeal, we affirm the district court's entry of judgment for Diamondback on this claim as well.

25

C.

We're now left with Anderson's state-law claim, which asserts that because her use of hemp-derived products was legal, her termination was unlawful under the North Carolina "lawful use of lawful products" statute:

> It is an unlawful employment practice for an employer to . . . discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the prospective employee or the employee engages in or has engaged in the lawful use of lawful products if the activity occurs off the premises of the employer during nonworking hours and does not adversely affect the employee's job performance or the person's ability to properly fulfill the responsibilities of the position in question or the safety of other employees.

N.C. Gen. Stat. § 95-28.2(b).   However, "[i]t is not a violation of [the statute] for an employer to . . . [r]estrict the lawful use of lawful products by employees during nonworking hours if the restriction relates to a bona fide occupational requirement and is reasonably related to the employment activities."   *Id.* § 95-28.2(c)(1).

As best we can determine, neither we nor the North Carolina state appellate courts have ever applied or interpreted the statute (or its exception).   But, as Anderson acknowledges, the law was not enacted with an eye toward hemp-derived products like CBD.   Rather, "the original purpose of [the North Carolina] statute[] was to protect tobacco users."   Appellant's Br. at 23; *accord, e.g.*, Barbara S. Magill & Worklaw Network, *Smoking*, in *Workplace Privacy: Real Answers and Practical Solutions* (Burton J. Fishman ed., 2nd ed. Supp. 2007), 2003 WL 25322918 ("As tobacco companies increasingly came under attack in the media and in the courts during the 1990s, anti-smoking prohibitions

26

spread to all corners of society," but "[s]ome states," including North Carolina, "enacted laws that protect the rights of smokers under certain circumstances.").

Yet Diamondback doesn't dispute that the statute applies equally to hemp-derived products. *See generally* Appellee's Br. at 31–42. Instead, it argues that Anderson "has not and cannot establish a prima facie case for wrongful discharge under N.C. Gen. Stat. § 95-28.2(b), as it is undisputed that (i) [she] was using THC, which is an unlawful product . . .; (ii) [her] use of THC occurred during working hours; and (iii) . . . [her] discharge was pursuant to a bona fide occupational requirement that was reasonably related to Plaintiff's employment activities,"—namely, "a drug testing policy targeted to maintain workplace safety and efficiency." Appellee's Br. at 32.

We find that Anderson's Section 95-28.2(b) claim fails for two reasons. First, she has failed to show that the hemp-derived products she used were, in fact, legal. And second, Diamondback has established, under Section 95-28.2(c)(1)'s exception, that its drug testing policy was related to a bona fide occupational requirement and reasonably related to its employment activities.

1.

Whether the "hemp" products Anderson used were indeed lawful is an issue of first impression for us. Anderson is correct that there's a legal distinction between so-called "hemp-derived" products and marijuana. Although both come from the same plant— "popularly called the hemp plant and designated *Cannabis sativa* in the Linnaean system

27

of botanical classification,"[9] *N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 3 (1st Cir. 2000); *see also 5 Things to Know About Delta-8 Tetrahydrocannabinol – Delta-8 THC*, FDA, https://www.fda.gov/consumers/consumer-updates/5-things-know-about-delta-8-tetrahydrocannabinol-delta-8-thc [https://perma.cc/5K3L-U6GV] (last updated May 4, 2022) (recognizing that marijuana and hemp are two varieties of the cannabis sativa plant)—they are not equal under the law.

According to the FDA, the cannabis sativa plant "contains more than 80 biologically active chemical compounds.  The most commonly known compounds are delta-9-tetrahydrocannabinol ([delta-9] THC) and cannabidiol."  Scientific Data and Information About Products Containing Cannabis or Cannabis-Derived Compounds; Public Hearing; Request for Comments, 84 Fed. Reg. 12969, 12970 (Apr. 3, 2019).  Delta-8 THC and cannabinol are two additional "major [cannabinoid] compounds" of the cannabis sativa plant.  Zerrin Atakan, *Cannabis, a Complex Plant: Different Compounds and Different Effects on Individuals*, 2 THERAPEUTIC ADVANCES PSYCHOPHARMACOLOGY 241, 245 (2012).

Importantly, "[a]ll [cannabis sativa plants] contain THC. . ., the ingredient that gives marijuana its psychoactive or euphoric properties."  *Hemp Council*, 203 F.3d at 3 (cleaned up).  This includes hemp, which again is "a variety of the species Cannabis Sativa—the same species of plant as marijuana."  *State v. Parker*, 860 S.E.2d 21, 28 (N.C. Ct. App.

---

[9] "In general, [marijuana] is derived from the flowers or leaves of the plant while the fibers used for [hemp products] are taken from the stalk."  *New Hampshire Hemp Council*, 203 F.3d at 3.

28

May 18, 2021).  "The difference between the two"—that is, hemp and marijuana— "is that . . . hemp contains very low levels of [THC], . . . the psychoactive ingredient in marijuana."  *Id.* (citing N.C. Gen. Stat. § 106-568.51(7) (2019) (expired 2022)).

Products derived from the cannabis plant are subject to a complex regulatory scheme.  "Parts of the Cannabis sativa plant have been controlled under the [f]ederal Controlled Substances Act ("CSA")[, 21 U.S.C. § 801 *et seq.*,] since 1970 under the drug class 'Marihuana,'" or marijuana.  Scientific Data and Information About Products Containing Cannabis, 84 Fed. Reg. at 12970 (citing 21 U.S.C. § 802(16)).  The CSA is just one part of the regulatory landscape, however: "Regulatory oversight of products containing cannabis or cannabis-derived compounds is complex and involves multiple [f]ederal and [s]tate agencies." *Id.*

The CSA makes it unlawful for an individual to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."[10]  21 U.S.C. § 841(a)(1).  To regulate the various "controlled substances" on the market, the CSA sorts them into five distinct categories, or "schedules," "depending in part on whether [a] particular drug has a currently accepted medical use." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 491–92 (2001); *see* 21 U.S.C. § 812(a).  "The Act then imposes restrictions on the manufacture and distribution of the substance

---

[10] The CSA defines a "controlled substance" as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C. § 802(6).

29

according to the schedule in which it has been placed." *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 492.

"Until recently, federal law prohibited the growth and cultivation of hemp." *Zini v. City of Jerseyville*, No. 3:23-cv-2120, 2024 WL 1367806, at *4 (S.D. Ill. Mar. 30, 2024). Then, the Agriculture Improvement Act of 2018 ("2018 Farm Act") amended the CSA to exclude from its reach certain hemp-derived products like CBD—which are, like marijuana, produced using parts of the cannabis plant and so contain chemical compounds like THC—from the definitions of illegal marijuana and illegal THC. *See* Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 12619, 132 Stat. 4490, 5018 (Dec. 20, 2018); *accord* 7 U.S.C. § 1639*o*.

Under the CSA in effect today (and at the time of Anderson's employment), marijuana remains a Schedule I controlled substance. 21 U.S.C. § 812 sched. I(c)(10); *accord* 21 C.F.R. § 1308.11(d)(23). Among other reasons, Schedule I drugs have been classified as such because they've been found to have "a high potential for abuse" and have "no currently accepted medical use in treatment in the United States." 21 U.S.C. § 812(b)(1).

Schedule I is the harshest classification of the five. *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 492. The other four schedules categorize and collect substances that have at least one "currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions." 21 U.S.C. § 812(b); *see also* 21 U.S.C. § 829 (authorizing the dispensation or distribution of controlled substances in schedules II-V (but not I) only (i) with a prescription or (ii) directly by a medical practitioner).

30

The term "marihuana" (marijuana) is defined by the CSA as consisting of "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin." 21 U.S.C. § 802(16)(A). But the CSA, as amended by the 2018 Farm Act, exempts from this definition "hemp, as defined in section 1639o of Title 7." 21 U.S.C. § 802(B)(i).

Schedule I of the CSA also designates as a controlled substance "any material, compound, mixture, or preparation, which contains any quantity of the . . . hallucinogenic substance[]" "[t]etrahydrocannabinol[] [(THC)], except for tetrahydrocannabinols in hemp (as defined under section 1639o of Title 7)." 21 U.S.C. § 812 sched. I(c)(17). This definition encompasses both naturally occurring and synthetic THC. 21 C.F.R. § 1308.11(d)(31)(i). But as with the new definition of marijuana, this provision of the CSA does *not* cover any product containing THC "that falls within the definition of hemp in 7 U.S.C. [§] 1639o." 21 C.F.R. § 1308.11(d)(31)(ii).

For its part, Section 1639o of Title 7, which is carved out as an exception to the definitions of both marijuana and THC, exempts "hemp," a product defined as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, [and] cannabinoids . . . with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis," from Schedule I of the CSA. 7 U.S.C. § 1639o(1). And the Drug Enforcement Administration ("DEA"), which administers the CSA, "has incorporated this definition [from § 1639o] into its regulations." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690 (9th Cir. 2022).

31

North Carolina's Controlled Substances Act mirrors the federal statute. The Act lists as controlled substances under its Schedule VI "(1) [m]arijuana" and "(2) [t]etrahydrocannabinols [(THC)], except for tetrahydrocannabinols found in a product with a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis." N.C. Gen. Stat. § 90-94(b).

Like the federal statute, "marijuana" is defined under North Carolina state law (1) in relation to its derivation from the cannabis plant—"the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant"—and (2) at the exclusion of "hemp or hemp products." *Id.* § 90-87(16). And like the federal statute, the North Carolina statute defines "hemp" as a substance derived from "the plant Cannabis sativa (L.) and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers . . . with a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis." *Id.* § 90-87(13a). And "hemp products," according to North Carolina law, are "all products made from hemp, including, but not limited to, cloth, cordage, fiber, food . . . seed, seed meal and seed oil for consumption." *Id.* § 90-87(13b).

To sum up, under state and federal law, then, certain hemp-derived products—those "with a delta-9 [THC] concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis," *id.* § 90-87(13a); *accord* 7 U.S.C. § 1639*o*(1)—don't come within the definition of an illegal controlled substance, and instead fall under the umbrella of a legal hemp-derived product. The critical distinction that separates illegal marijuana and

32

THC from legal hemp under both state and federal law is a product's delta-9 THC concentration. *See AK Futures*, 35 F.4th at 690 (observing that "the only statutory metric for distinguishing controlled marijuana from legal hemp [under the CSA] is the delta-9 THC concentration level").

2.

Anderson has admitted to taking several different cannabinoids during her employment with Diamondback: "CBD oil," "Delta 8, Delta 10, THC[-]O, and H[H]C." J.A. 234 ¶ 16. Each of these compounds naturally occurs in, or is extracted from, hemp.[11]

---

[11] *See, e.g.*, *CBD Oil – Are the Benefits Claimed Too Good To Be True?*, Cleveland Clinic (Dec. 29, 2021), https://health.clevelandclinic.org/cbd-oil-benefits [https://perma.cc/3G8X-6BSZ] (last visited July 22, 2024) (explaining that CBD (cannabidiol) is a compound derived from hemp, "a type of cannabis plant that contains very low levels of THC"); *5 Things to Know About Delta-8 Tetrahydrocannabinol – Delta-8 THC*, FDA (May 4, 2022), https://www.fda.gov/consumers/consumer-updates/5-things-know-about-delta-8-tetrahydrocannabinol-delta-8-thc [https://perma.cc/5K3L-U6GV] ("Delta-8 THC is . . . produced naturally by the cannabis plant but is not found in significant amounts in the cannabis plant[, so] . . . concentrated amounts of delta-8 THC are typically manufactured from hemp-derived cannabidiol (CBD)."); Sarah Glinski, *Delta-10 vs. Delta-8: What's the Difference?*, Forbes Health (Jan. 2, 2024), https://www.forbes.com/health/cbd/delta-10-vs-delta-8/ [https://perma.cc/48H6-CXXA] (recognizing that the same is true of delta-10 THC—it occurs naturally in hemp, even if only in low concentrations, so it's typically synthesized from delta-9 THC); Anna Kaufman, *What is THC-O? Similar to Delta-8, It's Making Waves in the Cannabis Market*, USA Today (last updated June 6, 2023, 9:18 AM), https://www.usatoday.com/story/news/health/2023/06/02/what-is-thco/70252031007/ [https://perma.cc/7CE8-2MVG] (explaining that THC-O derives from hemp, though in a roundabout sort of way: it is manufactured "by taking CBD and converting it to [d]elta-8 or [d]elta-9," then adding an "acetate" to those cannabinoids); Holly Ober, *Consumers Who Buy Cannabis Products Containing HHCs Could Be Getting Less Than They Hoped For*, UCLA Newsroom (Aug. 14, 2023), https://newsroom.ucla.edu/releases/cannabis-products-hhcs-biological-effect-safer-production [https://perma.cc/WQ7S-REGX] ("Most HHCs found in commercially available products are synthesized from [delta-8 and -9] THC by manufacturers using a process called catalytic hydrogenation.").

33

But that CBD and the other products are derived in some way from hemp, which *can* be legal in some cases, does not end the inquiry of whether the products Anderson took were *in fact* legal. To rebut Anderson's assertion that every hemp-derived product she took was legal, Diamondback argues that at least one of the products, THC-O, was illegal at the time Anderson was employed because it's an illegal synthetic cannabinoid. *See* Appellee's Br. at 32.

Though we agree with Diamondback that Anderson hasn't established that the products she took while employed for the company were legal, we do so on a different ground: There's no record evidence of the delta-9 THC concentration for any of these products.

3.

In challenging the first prong of the lawful products statute, Diamondback argues that at least one of the products Anderson admitted taking—THC-O—was illegal under state and federal law. This is so, Diamondback argues, because at the time of Anderson's employment, THC-O was not a lawful hemp-derived product under either federal or state law, but an illegal synthetic cannabinoid.

For this proposition, Diamondback relies on an interim final rule[12] promulgated by the DEA that Diamondback claims (1) was in effect at the time of Anderson's employment,

---

[12] Under the "good cause exception" of the Administrative Procedure Act, an agency need not go through formal notice-and-comment rulemaking process "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the [interim] rules issued)." 5 U.S.C. § 553(b)(B). And the resulting interim final rule (Continued)

34

and (2) had the effect of modifying the 2018 Farm Act's exclusion of "tetrahydrocannabinols in hemp," such that the Act did not disturb the Schedule I "control status" of synthetically derived cannabinoids. Appellee's Br. at 33. Indeed, the DEA's interim final rule states that "[a]ll synthetically derived tetrahydrocannabinols remain [S]chedule I controlled substances." *Id.* (quoting Implementation of the Agriculture Improvement Act of 2018, 85 Fed. Reg. 51639-01, 51641 (Aug. 21, 2020)). For such compounds, the interim final rule adds that the delta-9 THC concentration is irrelevant to "whether the material is a controlled substance." Implementation of the Agriculture Improvement Act of 2018, 85 Fed. Reg. at 51641. Therefore, under the DEA's regulation, these compounds are, without exception, an illegal controlled substance. *See id.*

Diamondback argues that the DEA in February 2023 "clarified that THC-O [specifically] . . . is a Schedule I controlled substance as THC-O does not naturally occur in the cannabis plant and can only be obtained synthetically." Appellee's Br. at 33 (citing Drug Enf't Admin., Diversion Control Div., Opinion Letter (Feb. 13, 2023).[13]

But the Ninth Circuit rejected this same argument as it applied to delta-8 THC. In *AK Futures*, a trademark infringement and copyright dispute, the court considered "whether the possession and sale of delta-8 THC is permitted under federal law and,

---

"carries immediate legal force." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 665 (2020).

[13] In that letter, the DEA took the position that THC-O doesn't "occur naturally in the cannabis plant and can only be obtained synthetically, and therefore do[es] not fall under the definition of hemp." Drug Enf't Admin., Diversion Control Div., Opinion Letter (Feb. 13, 2023).

35

consequently, whether a brand used in connection with delta-8 THC products may receive trademark protection." 35 F.4th at 690.

In that case, Boyd Street—a smoke shop accused of selling counterfeit versions of a manufacturer's "'Cake'-branded e-cigarette and vaping products containing delta-8 [THC]"—sought to defend itself by arguing that the manufacturer "d[id] not have protectible trademarks for its Cake products because delta-8 THC remains illegal under federal law." *Id.* at 685. And it cited as support the same interim final rule on which Diamondback now relies, contending that "according to the DEA, delta-8 THC remains a [S]chedule I substance because of its method of manufacture"—that it was "'synthetically derived' because it must be extracted from the cannabis plant and refined through a manufacturing process." *Id.* at 692.

The Ninth Circuit held that it didn't need to consider the DEA's position on synthetically derived substances because the definition of "hemp" under the 2018 Farm Act was unambiguous in its application to *all* products derived from the cannabis plant, "so long as they do not cross the 0.3 percent delta-9 THC threshold." *Id.* And, in any event, the Ninth Circuit continued, the cited regulation—Implementation of the Agriculture Improvement Act of 2018, 85 Fed. Reg. 51639-01—"suggest[ed] the source of the product—not the method of manufacture—is the dispositive factor for ascertaining whether a product is synthetic." *AK Futures*, 35 F.4th at 692; *accord* Implementation of the Agriculture Improvement Act of 2018, 85 Fed. Reg. at 51641 (distinguishing between "materials that are derived from the plant Cannabis sativa L" (legal hemp) and "synthetically derived tetrahydrocannabinols" (illegal Schedule I controlled substance)).

36

Thus, the court rejected Boyd Street's interpretation excluding synthetically derived substances from the definition of lawful hemp, and instead relied on the statute's express language excluding only products over a certain delta-9 THC concentration level. *See AK Futures*, 35 F.4th at 689–93.

Interpreting "the plain and unambiguous text of the [2018] Farm Act," the court held that such products were legal under federal law. *Id.* at 690. In the court's view, "[a] straightforward reading of § 1639*o* yields a definition of [exempted, legal] hemp applicable to all products that are sourced from the cannabis plant, contain no more than 0.3 percent delta-9 THC, and can be called a derivative, extract, cannabinoid, or one of the other enumerated terms." *Id*. And, critically, because AK Futures' "uncontradicted declaration" stated that "its delta-8 THC products [we]re 'hemp-derived' and contain 'less than 0.3' percent delta-9 THC," the court determined its products "fit comfortably" within this definition of legal hemp products. *Id.* at 691.

Between the DEA's February 2023 letter and *AK Futures*, we think the Ninth Circuit's interpretation of the 2018 Farm Act is the better of the two. And we're free to make that determination ourselves, despite a contrary interpretation from the DEA, because we agree with the Ninth Circuit that § 1639*o* is unambiguous, *see AK Futures*, 35 F.4th at 692, and because, even if it were ambiguous, we needn't defer to the agency's interpretation, *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) ("The APA, in short, incorporates the traditional understanding of the judicial function, under

37

which courts must exercise independent judgment in determining the meaning of statutory provisions.").[14]

Guidance concerning synthetic cannabinoids from other federal agencies also supports this conclusion. For example, the National Institute on Drug Abuse ("NIDA"), a division of the National Institute of Health, defines a synthetic cannabinoid as "a class of *lab-made* substances that are chemically similar to chemicals found in the cannabis plant, though they often produce very different effects." *Synthetic Cannabinoids*, Nat'l Inst. on Drug Abuse (Oct. 11, 2023), https://nida.nih.gov/research-topics/synthetic-cannabinoids [https://perma.cc/6JEC-SXRU] (emphasis added); *accord FDA and Cannabis: Research and Drug Approval Process*, FDA (last updated Feb. 24, 2023), https://www.fda.gov/news-events/public-health-focus/fda-and-cannabis-research-and-drug-approval-process [https://perma.cc/4MG2-QSC4] (distinguishing between compounds naturally occurring in and derived from the cannabis plant, like CBD and THC, and "[c]annabis-related compounds," which are "synthetic compounds [] created in a laboratory").

And in an explanation of the manufacturing process for products featuring synthetic cannabinoids, the NIDA noted that such products are "typically" manufactured by taking the "[i]llicitly manufactured synthetic cannabinoids" and "add[ing] [them] to liquid cartridges used in vaping devices or [] to dried, shredded plant material so they can be

---

[14] Though we "*may . . .* seek aid from the interpretations of [the agencies] responsible for implementing particular statutes," *Loper Bright*, 144 S.Ct. at 2262 (emphasis added), we find that the DEA's interpretation here lacks the "power to persuade," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

38

smoked." Nat'l Inst. on Drug Abuse, https://nida.nih.gov/research-topics/synthetic-cannabinoids (last visited July 22, 2024); *accord Spice/[]K2, Synthetic Marijuana Fact Sheet*, Drug Enf't Admin. (Oct. 2022), https://www.dea.gov/factsheets/spice-k2-synthetic-marijuana [https://perma.cc/EZS2-F6U5].

These definitions suggest that, rather than originating from organic matter—like the hemp-derived cannabinoids at issue—, *synthetic* cannabinoids are just that: compounds manufactured entirely out of synthetic materials. Because the statute is subject to this other reasonable (and, we think, better,) interpretation, we reject Diamondback's contention that the DEA's interim final rule or letter mandates a finding that THC-O is illegal.

4.

Our ruling though is of no help to Anderson because she offered no evidence about the delta-9 THC concentrations of the purportedly lawful products she used such that we could determine whether those products were legal under state or federal law.

That the products were sold "over the counter" in gas stations and stores around North Carolina is not itself evidence of their legality. On the contrary, these products are notoriously difficult to regulate and often contain higher concentrations of THC than permitted by law (even if they advertise otherwise). *Cf.* Cleveland Clinic, https://health.clevelandclinic.org/cbd-oil-benefits [https://perma.cc/3G8X-6BSZ] (last visited July 22, 2024), ("If you're purchasing CBD oil and other products online or from a local vendor, Dr. Terpeluk says there's no real way of knowing the purity of the CBD you're using, as it could be mixed with other cannabinoids, such as . . . delta-8, or THC.").

39

Nor does Nurse Hudson's note resolve this issue in Anderson's favor. In it, Hudson writes to "verify" that Anderson is taking "over the counter CBD products" or "the natural product of CBD" "for anxiety and muscle spasm[s]." J.A. 249. And Hudson states, without more, that "[i]t is common for THC to show up in a drug urine screen because of these products." J.A. 249. The note doesn't provide an accounting of the specific products Anderson was taking, much less their delta-9 THC concentrations. So this isn't enough to prove that the products were legal.

By contrast, the Ninth Circuit in *AK Futures* determined that the hemp-derived product in that case was legal under the 2018 Farm Act precisely because it had such evidence. The court recognized that this conclusion "necessarily depend[ed] on the veracity of the company's claim that these products contain no more than 0.3 percent delta-9 THC." *AK Futures*, 35 F.4th at 691. In other words, the court reasoned, "[a] showing that AK Futures' products contain *more* than the permitted threshold level of delta-9 THC would defeat AK Futures' entitlement to trademark protection" because the products would not be legal under the federal definition of hemp. *Id.* (emphasis added) (observing that "[a]ccording to the DEA and FDA, 'many cannabis-derived products do not contain the levels of cannabinoids that they claim to contain on their labels.' (quoting Implementation of the Agriculture Improvement Act of 2018, 85 Fed. Reg. 51639-01, 51641 (Aug. 21, 2020))).

And we find Anderson's reliance on the evidence of the delta-9 THC content of the delta-8 THC "Cake" products in *AK Futures* misguided. *See* Reply Br. at 11 (arguing that the THC-O she was taking was a legal hemp product because, like delta-8 THC, it "is a

40

'derivative, extract, or cannabinoid originating from the cannabis plant and containing not more than 0.3 percent delta-9 THC,' as it is produced by combining delta-8 with another chemical, acetic anhydride" (quoting *AK Futures*, 35 F.4th at 691)).

Again, the Ninth Circuit in *AK Futures* could determine that the delta-9 THC concentration in those products was lawful because the appellant there submitted evidence to that effect. But that evidence tells us nothing about the chemical makeup of the products here.

At no point during Anderson's employment were hemp-derived products containing a greater concentration of delta-9 THC than 0.3% on a dry weight basis legal, either federally or locally. So without evidence of the delta-9 THC concentration of these products, no factfinder could reasonably find that they were indeed "lawful"—a prerequisite to the applicability of the lawful products statute.

D.

1.

But even if the hemp-derived products Anderson took were covered by the lawful products statute, that wouldn't end our analysis of her state-law claim. That's because Diamondback has invoked an exception to the lawful use of lawful products statute which states that "[i]t is not a violation of [N.C. Gen. Stat. Section 95-28.2] for an employer to…[r]estrict the lawful use of lawful products by employees during nonworking hours if the restriction relates to a bona fide occupational requirement and is reasonably related to the employment activities." N.C. Gen. Stat. § 95-28.2(c)(1).

41

Diamondback argues that "[Anderson]'s discharge was pursuant to a bona fide occupational requirement that was reasonably related to [the] employment activities – a drug testing policy targeted to maintain workplace safety and efficiency." Appellee's Br. at 32. We agree with the district court that even if the products Anderson used were lawful, and even if they were used "off the premises of the employer during nonworking hours," N.C. Gen. Stat. § 95-28.2(b), Diamondback is still entitled to judgment as a matter of law on Anderson's § 95-28.2(b) claim based on the bona fide occupational requirement exception.

2.

There's little guidance from the North Carolina courts on how the lawful use of lawful products statute applies to the facts of a specific case. As relevant here, we've found no decision addressing whether the elements of the Section 95-28.2(c)(1) exception are meant to be read, either as Diamondback and the district court have read it, together as a single requirement—"a bona fide occupational requirement reasonably related to employment activities," *Anderson*, 661 F. Supp. 3d at 427, or whether the elements of the statute are more appropriately read in the disjunctive and as going to "the restriction" at issue. That is, whether "the restriction" (presumably, Diamondback's drug testing policy, applicable to all "current and prospective employees," J.A. 133), was *both* (1) "relate[d] to a bona fide occupational requirement," *and* (2) "reasonably related to the employment activities," § 95-28.2(c)(1). In other words, is an occupational requirement bona fide *because* it's reasonably related to the employment activities, or must a restriction, to qualify

42

under the exception, be *both* related to a bona fide occupational requirement and related to the employment activities?

Anderson has seemingly accepted the district court's construction of the exception. She argues on appeal only that Diamondback "has not and cannot identify any actual 'bona fide occupational requirements' that are 'reasonably related' to Anderson's employment activities." Appellant's Br. at 28. But we agree with the district court that Anderson misapprehends the statute, which mandates that the employer's requirement be reasonably related to "*the* employment activities," N.C. Gen. Stat. § 95-28.2(c)(1), not *Anderson's* employment activities. So we instead ask whether the drug testing policy was a bona fide occupational requirement reasonably related to Diamondback's employment activities.

Diamondback points to the section in its Employee Manual explaining that its policy prohibiting drug and alcohol abuse was enacted to uphold its "commit[ment] to providing a safe and productive workplace for its employees." J.A. 141. While the term "employment activities" is vague, we see no reason (nor does Anderson offer one) to depart from the district court's view that maintaining a safe and productive work environment constitutes a bona fide occupational requirement reasonably related to the employment activities. *See Anderson*, 661 F. Supp. 3d at 428.

As the district court noted, at least one court interpreting a similar Colorado law has defined "bona fide occupational requirement" "as a requirement 'that an employer imposes in good faith, honestly, and sincerely.'" *Id.* (quoting *Miller v. Inst. for Def. Analyses*, No. 17-CV-02411, 2019 WL 937860, at *11 (D. Colo. Feb. 26, 2019) (defining term according to its "plain and ordinary meaning"), *aff'd*, 795 F. App'x 590 (10th Cir. 2019)). And

43

indeed, as the Tenth Circuit recognized on appeal in the same case, the exception for bona fide work requirements "to [the] protection of the [lawful products] statute" "'reflects a legislative attempt to balance an employee's right to engage in lawful activity away from work with an employer's legitimate business interests and needs.'" *Miller*, 795 F. App'x at 597 (quoting *Ruiz v. Hope for Child., Inc.*, 352 P.3d 983, 985–86 (Colo. App. 2013)).

Based on this understanding, the district court "ha[d] no difficulty finding that [Diamondback] has shown that it acted in good faith, honestly, and sincerely in implementing a drug policy to promote workplace safety and productivity in the workplace." *Anderson*, 661 F. Supp. 3d at 428. "Further," the district court found "for the same reason that [Diamondback]'s policy was reasonably related to its employment activities in that it was related to maintaining safety in the workplace." *Id.*

We see no reason to depart from the district court's thoughtful analysis of this issue of first impression.

*   *   *

For these reasons, the district court court's judgment is

*AFFIRMED*.

44

RICHARDSON, Circuit Judge, concurring in part:

I am pleased to join all but Part III.C.2.i of our Chief Judge's majority opinion. In that part, the majority decides that one of the substances Anderson used, THC-O, was lawful because it falls within the hemp exclusion from the federal cannabis ban. But this is only one of the three reasons we provide for rejecting Anderson's state-law claim. And it raises a thorny question. Because we need not reach that question—and because the question is more difficult than the majority posits—I would save it for another day.

Title 7, section 1639o of the U.S. Code excludes "hemp" from the federal ban on cannabis. That section defines "hemp" as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o. Section 1639o thus sets out two conditions that a hemp product must satisfy to escape the cannabis prohibition. First, the product must be "the plant Cannabis sativa L." or else be "a part of that plant." Second, delta-9 THC must compose less than 0.3% of the product's dry weight.

It is unclear whether THC-O satisfies the first condition. To start, THC-O cannot be found in "the plant."[1] Instead, it is produced by performing chemical operations on

---

[1] *See* Letter from Terrence L. Boos, Drug Enf't Admin., to Rod Kight, Kight Law Office PC (Feb. 13, 2023) (noting that THC-O does not "occur naturally in the cannabis plant and can only be obtained synthetically, and therefore do[es] not fall under the definition of hemp").

45

delta-9, delta-8, or delta-10 THC.[2]  So we might conclude that THC-O is not "part" of the plant.  But it *is* a "derivative[]" of some THC isomers.

So the hard question is whether such derivatives, to be "includ[ed]," must also be present in the plant.  And because some derivatives *are* present in the plant,[3] it is not immediately clear whether only those derivatives—rather than all derivatives—fall under § 1639*o*.

As the majority notes, the DEA has said a derivative must be present in the plant to fall under § 1639*o* and therefore concluded that synthetic cannabinoids like THC-O cannot count as excepted hemp.  *See* Implementation of the Agriculture Improvement Act of 2018, 85 Fed. Reg. 51639, 51641 (Aug. 21, 2020).  But the Ninth Circuit has said the derivatives don't need to be present in the plant, reasoning that synthetics can be excepted so long as they are ultimately "sourced from" the plant.  *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690–91 (9th Cir. 2022).

There is some reason to think the DEA has the better of this debate.  We seldom treat "including" phrases as expanding the terms they describe.  Instead, we understand that such phrases are *limited* by the terms they describe.  *See, e.g.*, *P.C. Pfeiffer Co. v. Ford*,

_____

[2] For an overview of this process, see generally Alaina K. Holt et al., *Δ⁸-THC, THC-O Acetates and CBD-di-O Acetate: Emerging Synthetic Cannabinoids Found in Commercially Sold Plant Material and Gummy Edibles*, 46 J. Analytical Toxicology 940 (2022).

[3] Some "derivatives" are "part of that plant."  Consider delta-8.  Delta-8 occurs naturally in the plant.  *See* Holt et al., *supra*, at 941.  But it occurs in minuscule quantities, so most commercially sold delta-8 is synthesized by performing chemical operations on CBD.  Accordingly, delta-8 is both a derivative (of CBD) and part of the plant.

46

444 U.S. 69, 77 n.7 (1979) (explaining that an "including" phrase identifies the items it enumerates as "part of the larger group" described, and rejecting the argument that "'including' means 'and' or 'as well'"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 132 n.1 (2012) ("To *include* is to contain as a part or member." (quoting *The Random House Dictionary of the English Language* 967 (2d ed. 1987)).[4] If that principle applies here, then a given derivative can be included only if it is "part of the plant."[5]

---

[4] It is worth noting one distinction that might bedevil unwary interpreters:  Courts have sometimes said that "includes" is "a term of enlargement, and not of limitation." *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) (internal quotation marks omitted); *see also Am. Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933) (similar).  The point of such remarks is that "including" lists aren't usually exhaustive.  *See, e.g.*, *Burgess*, 553 U.S. at 131 n.3 ("[W]hen an exclusive definition is intended the word 'means' is employed, . . . whereas here the word used is 'includes.'" (quoting *Groman v. Comm'r*, 302 U.S. 82, 86 (1937)).  But these remarks do *not* suggest that "including" phrases enlarge the categories they illustrate—or give courts license to expand those categories beyond their definitional borders.  *See* Bryan A. Garner, *Garner's Modern English Usage* 500 (4th ed. 2016) ("[I]nclude . . . has traditionally introduced a non-exhaustive list").  Exhaustive or not, "including" phrases list items that are *part of* the defined class.  *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition"; instead, it "connotes simply an illustrative application of the general principle." (citing *Phelps Dodge Corp. v. Nat'l Lab. Rels. Bd.*, 313 U.S. 177, 189 (1941)); *Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125 (1934)); *see also Include*, *Black's Law Dictionary* (12th ed. 2024) ("To contain as a part of something.  The participle *including* typically indicates a partial list . . . ."); *Include*, *Webster's Third New International Dictionary Unabridged* (1981) ("to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate").

[5] The text of the general cannabis definition lends some credence to this reading of § 1639*o*'s hemp definition.  Federal law defines "marihuana" as "all parts of the plant . . . *and* every compound, manufacture, salt, derivative, mixture, or preparation of such plant."  21 U.S.C. § 802(16)(A) (emphasis added).  Contrariwise, § 1639*o* replaces "and" with "including."  Perhaps we should attribute that difference to meaningful choice, not happenstance.  *See* Scalia & Garner, *supra*, at 170–71.

47

Yet the DEA's interpretation faces a problem too: If derivatives and extracts can count as hemp only if they are part of the plant, then some terms on § 1639*o*'s "including" list may turn out to be surplusage. For instance, the list includes not just derivatives and extracts but "acids, salts, and salts of isomers." 7 U.S.C. § 1639*o*. Does the plant contain any salts or salts of isomers? The parties do not say. And the years that have passed since I took organic chemistry leave me ill-equipped to opine. But if the plant does not, for example, naturally contain salts of isomers, then § 1639*o*'s "salts of isomers" phrase would appear to have no consequence under the DEA's interpretation. *See* Scalia & Garner, *supra*, at 174–79 (discussing the surplusage canon). That problem *may* lead us to question the DEA's reading. Perhaps, rather than adopt the DEA's reading, we should consider whether § 1639*o*'s "including" list provides context that suggests a broader understanding of "part of that plant."[6]

In any event, whether synthetic derivatives like THC-O count as excepted hemp is a difficult question. The DEA and Ninth Circuit interpretations did not fully consider the issue. Neither did the parties. And, as the majority rightly concludes, Anderson's state-

---

[6] To illustrate the linguistic challenge, consider a stylized example. Imagine that I tell you I sent dinner invitations to "my immediate family, including Perry, Gail, and Matthew." The people listed are part of the group identified as "my immediate family." But someone named Matthew would be invited only if he was my brother Matthew; you would understand that my law clerk Matthew was not invited. Not that the list does not provide context that informs the meaning of "immediate family": The inclusion of my daughter, mother, and brother would help you understand that my "immediate family" goes beyond the family I currently live with. But that context is helpful only because "immediate family" could reasonably be understood to have a broader or narrower meaning. *Compare* 26 U.S.C. 9035(b) (broader definition of "immediate family") *with* 16 U.S.C. § 3198(c)(1) (narrower definition of "immediate family member").

48

law claim fails for other reasons. So I would leave this interpretive question for another day.

49